1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

H. STAN JOHNSON, ESQ.
Nevada Bar No.: 265
BRIAN A. MORRIS, ESQ.
Nevada Bar No.: 11217
CJD LAW GROUP, LLC
6293 Dean Martin Drive, Ste. G
Las Vegas, NV 89118
Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| WINDMILL & EASTERN, LLC, a Nevada limited liability company,<br><br>                    Plaintiff,<br><br>v.<br><br>SIMON SHAKIB, an individual and as the trustee of the Nevada K, LLC Defined Pension Plan; ZANNA SHAKIB, an individual and as the trustee of the Nevada K, LLC Defined Pension Plan; NEVADA K, LLC, a Nevada limited liability company, and DOES I through X; and ROE ENTITIES I through X, inclusive,<br><br>                    Defendants. | Case No.: 2:11-cv-01082-LDG-PAL |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, by and through their counsel of record, H. Stan Johnson of CJD Law Group, LLC, hereby files for Summary Judgment against Plaintiff. The automatic stay that was imposed at the time of the filing of Defendant Simon Shakib's bankruptcy has been was modified by the Bankruptcy Court on April 3rd 2012 to allow the Federal Court action and the State Court action to proceed through judgment.

This Motion is based upon the memorandum of points and authorities attached hereto, the

1

record in this case, and such other pleadings, judicial notice of which is requested pursuant to Federal Rule of Evidence 201, the Affidavit of Defendant, Simon Shakib, and evidence to be submitted in support of the relief requested herein.

Dated this 5th day of August, 2011.

CJD LAW GROUP, LLC


By:      /s/ H. Stan Johnson                    .
         H. STAN JOHNSON, ESQ.
         Nevada Bar No.: 0265
         BRIAN A. MORRIS, ESQ.
         Nevada Bar No.: 11217
         6293 Dean Martin Drive, Ste. G
         Las Vegas, NV 89118


## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### BRIEF STATEMENT OF FACTS

That on December 30, 2004 Defendants, Simon Shakib and Zanna Shakib executed the Investors Group of Nevada, LP Defined Benefit Pension Trust (the "Trust").  (Plaintiff's Motion, Exhibit 1-A)(See also Affidavit of Simon Shakib, ¶2, attached herein as Exhibit A)  Subsequent to the Trust, an Amendment was executed which changed all the references to, "Investors Group of Nevada, LP" to "Nevada K, LLC" and the Trust was formerly renamed as the "Nevada K, LLC Defined Benefit Pension Plan."  (See Amendment dated October 17, 2006, attached herein as Exhibit B)  That the certificate of deposit (the "CD") held in the name of Nevada K, LLC, Defined Benefit Pension Plan is property of a pension plan governed by Early Retirement Income Security Act of 1974 ("ERISA"). (Affidavit, ¶3)  Pursuant to the Trust the certificate of deposit could not have been pledged as collateral

1    for any loan, including the loan subject to this litigation.    That in conjunction with Bank of Nevada's

2    agreement to fund the development of real property, the CD was allegedly pledged to secure a loan on

3    or about July 30, 2007[1].  (Id. at ¶4)   That prior to the execution of the loan documents Defendants

4    provided a copy of the Trust and were aware that the CD was held in the name of the Nevada K, LLC,

5    Defined Benefit Pension Trust. Indeed, the Plaintiff would have been required by banking regulations to

6    obtain a copy of the Trust.  (Id. at ¶5)  The Pledge and Security Agreement was executed only by Simon

7    Shakib as Manager of Nevada K, LLC and personally.  (Plaintiff's Motion, Exhibit 1-H, Pg. 5)(Id. at

8    ¶6)  The Pledge and Security Agreement was not signed by the trustee of the Trustee, nor was the Trust

9    a party to the Pledge and Security Agreement.  (Id. at ¶7)  Defendant, Simon Shakib is also informed

10   that there are other employees that should have been included in the pension plan and that these

11   employees are being included to accurately reflect the obligations of the Trust to the applicable

12   employees.  (Id. at ¶8)

13        Bank of Nevada (the "Bank") made certain false representations to Defendants at the time the

14   account was opened for the Trust and before the loan documents and Guaranty were signed.    Before

15   the documents were signed, the Bank represented to Defendants that they would provide all the

16   financing necessary to construct the Windmill Market Shopping Center and would provide the

17   financing to pay for the tenant improvements, which would be necessary for the leasing of the Center.

18   (Id. at ¶9)        These representations were false, in that the Bank did not intend to fully fund the loan

19   as agreed and did not intend to provide the financing to pay for the tenant improvements.  (Id. at ¶10)

20   These omissions and misrepresentations were and are material to the Defendants, because they would

21   not have incurred the extent of risk that they did with this private lender had they known that they did

22   not intend to fully fund the loan and pay for the tenant improvements or to reimburse the Defendants for

23   the expense of the tenant improvements as represented both verbally and in writing to the Defendants.

24   (Id. at ¶11)

25

26

27   [2]  The allegations of fraud on the part of Bank of Nevada have been made in the related Clark County District Court Case identified as *Windmill & Eastern, LLC v. Windmill & Market, LLC and Simon Shakib*, Case No.: A-10-623070-C. Defendants request that this Court take judicial notice of that action pursuant to FRE 201(d), as such Answer, Counterclaim

28

1    These types of misrepresentations continued throughout the term of the loan. Specifically, upon

2   information and belief, the Bank failed to fully fund the loan and pay for tenant improvements, which

3   prevented the Center from entering into leases with a number of tenants during 2008 and 2009.

4   Defendants did not know that the representations were false. Indeed, it was not until the Bank failed and

5   refused to fully fund the loan and either pay for, or reimburse the Defendants for the tenant

6   improvement expenses that Defendants discovered that the Bank had misrepresented that it would fully

7   fund the loan and pay the tenant improvement expenses.  (Id. at ¶12)

8    Defendants suffered damages proximately caused by reliance on the false statements. Such

9   damages consist of, *inter alia,* (a) lost past and future benefits and earnings Plaintiff would have

10   realized had the Bank not committed the fraud; (b) lost business and investment opportunities; and (c)

11   interest.  Therefore, as a result, they should be entitled to a setoff from any alleged exposures created by

12   the Guaranty[2].  (Id. at ¶13)

**II.**

**LEGAL STANDARDS**

**SUMMARY JUDGMENT STANDARDS**

FRCP 56(a) states:

> A party may move for summary judgment, identifying each claim or defense--or the part of each
> claim or defense--on which summary judgment is sought. The court shall grant summary
> judgment if the movant shows that there is no genuine dispute as to any material fact and the
> movant is entitled to judgment as a matter of law. The court should state on the record the
> reasons for granting or denying the motion.

The standards and procedures for granting partial summary judgment, also known as summary

adjudication, are the same as those for summary judgment.  See *Calif. v. Campbell*, 138 F.3d 772, 780

---

[2]  The allegations of fraud on the part of Bank of Nevada have been made in the related Clark County District Court Case
identified as *Windmill & Eastern, LLC v. Windmill & Market, LLC and Simon Shakib*, Case No.: A-10-623070-C.
Defendants request that this Court take judicial notice of that action pursuant to FRE 201(d), as such Answer, Counterclaim

(9th, 1998); *Continental Insur. Co. v. Cota*, 2010 WL 383367 *2 (N.D. Cal. Jan. 27, 2010).  A plaintiff moving for summary judgment must demonstrate all elements of its claim to prevail.  *Lockwood v. Wolf Corp.*, 629 F.2d 603, 611 (9th, Cir.1980).

Summary judgment is appropriate only when no genuine issue of fact remains for trial and the moving party is entitled to judgment as a matter of law.  *VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.*, 784 F.2d 1472 (9th Cir. 1986).  See also *Insurance Corporation of America v. J. Rubin, M.D.*, 107 Nev. 610, 818 P.2d 389 (1991)

For purposes of a motion for summary judgment, the non-moving party's version of the facts must be accepted as true and all disputes resolved in its favor. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074 (1976); *United States v. Diebold*, 369 U.S. 654, 82 S.Ct. 993 (1962); *Ashton v. Cory*, 780 F.2d 816 (9th Cir. 1986).

## III.

## <u>LEGAL ARGUMENT</u>

**A.     PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED**

**1.     The Court Should Find The Plan In Question Is An ERISA Plan**

The Plan as established was an ERISA Plan and did cover employees.

As stated in the supporting Affidavit of Simon Shakib, there were other employees who were able to participate in the Plan and the plan as established covered the other employees.  The Defendants have produced documents in this litigation that conclusively show there were other participant in the plan.

The Court in *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 124 S. Ct. 1330 (2004) in addressing whether owners may be employees, is instructive as it specifically

discusses the employee definition under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C.S. § 1001 et. seq.  Based on *Yates*, the Plan would allow the Defendants to participate as employee owners and the Plan would be subject to ERISA.

Furthermore, the *Yates Court* briefly analyzed the history of benefits plans that allowed working owners to participate in ERISA like plans, which permitted their participation.

> Title I of ERISA and related IRC provisions expressly contemplate the participation of working owners in covered benefit plans. *Id.*, at 14-16. Most notably, several Title I provisions partially exempt certain plans in which working owners likely participate from otherwise mandatory ERISA provisions. Exemptions of this order would be unnecessary if working owners could not qualify as participants in ERISA-protected plans in the first place.  (*Id. at 14*)

> In sum, because the statute's text is adequately informative, we need not look outside ERISA itself to conclude with security that Congress intended working owners to qualify as plan participants.

> Congress' aim is advanced by our reading of the text. The working employer's opportunity personally to participate and gain ERISA coverage serves as an incentive to the creation of plans that will benefit employer and nonowner employees alike. See Brief for United States as *Amicus Curiae* 21-22. Treating working owners as participants not only furthers ERISA's purpose to promote and facilitate employee benefit plans. Recognizing the working owner as an ERISA-sheltered plan participant also avoids the anomaly that the same plan will be controlled by discrete regimes: federal-law governance for the nonowner employees; state-law governance for the working owner. See, *e.g., Agrawal*, 205 F.3d at 302 (because sole shareholder does not rank as a plan participant under ERISA, his state-law claims against insurer are not preempted).  (Id. at 17)

In addition to the fact that there is ERISA coverage the Defendants have shown the assets of the plan were improperly pledged and that under state law the Plaintiff is not entitled to the collateral.  The Plaintiff is completely ignoring the elephant in the room: namely that the alleged pledge is unenforceable and void due to obvious failures in the documents presented by the Plaintiff.

As explained below the documents allegedly securing the collateral are clearly defective and misleading.  It appears there are two possibilities that would explain the state of the documents.  Either the Plaintiff was grossly negligent or the Plaintiff knew that the pledging of the collateral was a

prohibited transaction under ERISA and they intentionally misled the borrower and the guarantor as to the nature of the transaction and crafted documents to hide the fact that the Bank was entering into a prohibited transaction under section 406 of ERISA and under section 4975 of the IRC.   If the documents had reflected the true nature of the transaction the Bank's loan committee or other officers of the Bank would have realized this part of the loan was a prohibited transaction and the loan would have been modified to remove the additional collateral.

Since on the face of the documents as supplied by the Plaintiff to this Court the Plaintiff either entered into a prohibited transaction or there was no pledge of the collateral because the documents are so defective that they did not convey any rights to the collateral to the Plaintiff.  Those are the only two possibilities.

If the documents are enforceable as alleged by the Plaintiff, then at the time of the alleged transaction the Plaintiff entered into a prohibited transaction and the only remedy under ERISA and the IRC would be to unwind the transaction to put the parties in the same position as before the transaction. The Plaintiff had its time to conduct its due diligence at the time of the transaction and should now be estopped from arguing that the transaction is now proper because after the fact they allege this is a non ERISA plan.  That does not solve the problem that they either entered into a prohibited transaction or the transaction is defective and unenforceable.

**2.      The Pledge and Security Agreement Was Not Executed By The Proper Entity.**

The Trust agreement was established on December 30th 2004.  Regardless of the ERISA coverage issue, the Trust is a separate legal entity and holds title to the certificate of deposit in question. As such only the Trustees of the Trust could execute the Pledge and Security Agreement.   It is obvious that the Pledge Agreement was signed by the manager of Nevada K, LLC and Simon Shakib in his personal capacity and not the Trustee(s) of the Trust.  Therefore, the Pledge and Security Agreement is

defective and unenforceable as against the Trust or the assets of the Trust and the execution of the

pledge by parties that had no interest in the collateral did not establish a security interest in the property

of the Trust.

Indeed it appears the Plaintiff tried to create a security interest in the proposed collaterial

through not only the wrong entity, but through an entity that was also not a debtor in the transaction.  In

contrast to the statement in the Pledge and Security Agreement, Nevada K, LLC is not a party to the

loan either as a borrower or guarantor.  Therefore, the statement in the Pledge agreement that both

Nevada K, LLC and Simon Shakib have executed or will execute a guaranty agreement is false.  Since

a security interest is an interest in personal property that secures payment or performance of an

obligation, there must be a promissory note, another evidence of indebtedness or a contract that sets

forth the payment and/or other obligations of the debtor are secured by the security interest.  Here

Nevada K, LLC is not a debtor of the Plaintiff and neither is the Trust that holds title to the certificate

of deposit.

Under Article 9 of the UCC, which would govern this transaction, a security interest "attaches"

to the collateral when it becomes enforceable by the secured party against the debtor with respect to the

collateral.  Under Article 9 in order for the security interest to be enforceable against a debtor or third

parties with respect to the collateral  EACH (NRS 104.9203(b)) of the following conditions must be

satisfied:

(a) Value has been given.  Value has been given when there is consideration sufficient to

support the contract such as when the secured party makes a loan or provides some other financial

accommodation to the debtor. In the matter before this Court, neither Nevada K, LLC nor the Trust is

party to the loan. [While Simon Shakib individually is a guarantor of the loan, he has no ownership or

right to transfer rights in the certificate of deposit.]

(b) The debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party.  A debtor will have rights in the collateral when the debtor owns the collateral. The secured party cannot obtain greater rights than the debtor holds.  Here it is undisputed that the certificate of deposit is owned by the Trust, who is not a party to the Pledge and Security Agreement.

(c) One of the following conditions is met:

(i) The debtor has authenticated a security agreement that provides a description of the collateral.

(ii) The collateral is not a certificated security and is in the possession of the secured party under Section 9-313 pursuant to the debtor's security agreement.

(iii) The collateral is a certificated security in registered form and the security certificate has been delivered to the secured party under Section 8-301 pursuant to the debtor's security agreement.

(iv) The collateral is deposit accounts, electronic chattel paper, investment property, or letter-of credit rights, and the secured party has control under Section 9-104, 9-105, 9-106, or 9-107 pursuant to the debtor's security agreement.

**3.     The CD As Property of the Trust Was Unable to Be Pledged Due to Anti-Alienation Provisions**

Even assuming arguendo that the Pledge and Security Agreement was signed by a debtor that had rights in the collateral, the Pledge would be contrary to the express language of the Trust.

In Article XII of Trust at Section E that provision states in part:

Spendthrift Provisions.  Except with respect to a Participant loan or a Qualified Domestic Relations Order, **neither the Employer nor the Trustee shall recognize any transfer, mortgage, pledge, hypothecation, order or assignment by any Participant or Beneficiary of all or any part of his or her interest under the Trust. Any attempt by a Participant or Beneficiary to assign, alienate, sell, transfer, pledge or encumber his or her benefits shall be void.**  A Participant's or Beneficiary's interest shall not be subject in any manner to transfer

by operation of law and shall be exempt from the claims of his or her creditors or other claimants (including but not limited to, debts, contracts, liabilities or torts) from all orders decrees, levies, garnishments and/or executions and other legal or equitable process or proceedings against such Participant or Beneficiary to the full extent which may be permitted by law.  (Emphasis Added)

Based on the express provisions of the Trust, which Bank of Nevada had in their possession, the Pledge and Security Agreement are deemed void.   The *In re Shuman* Court stated in reference to defining a Nevada spendthrift trust:

> No specific language is necessary to create a spendthrift trust, Nev. Rev. Stat. § 166.050, but the following requirements must be met: (1) the beneficiary or beneficiaries must be named or clearly referred to in the writing, Nev. Rev. Stat. § 166.080; (2) there must be a provision for the support, education, and maintenance of the beneficiary, Nev. Rev. Stat. § 166.090; *Ambrose v. First Nat'l Bank,* 87 Nev. 114, 118, 482 P.2d 828 (1971); (3) all income from the trust must be for the benefit of the beneficiary, except for fees, costs and taxes, Nev. Rev. Stat. § 166.100; (4) and the trust must restrain and prohibit "the assignment, alienation, acceleration and anticipation of any interest of the beneficiary, under the trust by the voluntary or involuntary act of the beneficiary or by operation of law or any process at all." Nev. Rev. Stat. § 166.120.  (*Id. at 295*)

The Trust contains all of the necessary provisions and includes, as mentioned above an anti-alienation clause.  NRS 166.120(1) states:

> 1.  A spendthrift trust as defined in this chapter restrains and prohibits generally the assignment, alienation, acceleration and anticipation of any interest of the beneficiary under the trust by the voluntary or involuntary act of the beneficiary, or by operation of law or any process or at all. The trust estate, or corpus or capital thereof, shall never be assigned, aliened, diminished or impaired by any alienation, transfer or seizure so as to cut off or diminish the payments, or the rents, profits, earnings or income of the trust estate that would otherwise be currently available for the benefit of the beneficiary.

The Ninth Circuit has held that the assets of such a trust are not executable:

> The Ninth Circuit has held that a valid spendthrift trust created under state law can be excluded from the estate pursuant to section 541(c)(2). *See Ehrenberg v. Southern California Permanente Medical Group (In re Moses)*, 167 F.3d 470, 473 (9th Cir. 1999). In this case, the Retirement Plan contained an anti-alienation provision restricting Debtor's ability to transfer his beneficial interests and the ability of third parties to levy upon Debtor's interests, as of the date of bankruptcy. (*Cisneros v. Kim* (*In re Kim*, 257 B.R. 680; 2000 Bankr. LEXIS (2000)

In that matter the Court held that assets of a retirement plan were non-executable even in bankruptcy setting due to the non-alienation provision, "In this case, the Retirement Plan contained an anti-alienation provision restricting Debtor's ability to transfer his beneficial interests and the ability of third parties to levy upon Debtor's interests …" (*Id. at 689*)  The Court in *Barkley v. Conner* (*In re Conner*), 73 F.3d 258, 1996 U.S. App. LEXIS 346 (1995) noted in discussing ERISA plan and spendthrift trusts noted, "…spendthrift trusts are not self-settled, not freely revocable and **not alienable**." (*Id. at 260*)

In sum the CD, which is property of the Trust was unable to be pledged, as any pledge would be unenforceable under state law regardless of the implications of ERISA.  The Pledge and Security Agreement are void by the express language of the Trust and unlawful according to state law prohibiting the alienation of spendthrift trusts.  As the Trust was non-alienable, Plaintiff's contention that pledge of the CD was a distribution or transfer is baseless, as no transfer or distribution was authorized.

**4.  The Plaintiff Did Not Perfect Its Alleged Security Interest.**

The UCC-1 produced by Plaintiff states in Section 1a. the debtor's name is Windmill Market, LLC.  Windmill Market, LLC has no interest in the CD or the Trust.  Windmill Market is not the entity identified in the Pledge and Security Agreement; the parties in that agreement were Simon Shakib, personally and as Manager of Nevada, K, LLC.  Windmill Market, LLC cannot therefore be the  party to allegedly perfect the Plaintiff's interest in the CD as they had no standing to act in such capacity nor were they a party to the Pledge and Security Agreement.  The UCC-1 is on its face defective and establishes no securitizing ties to the CD which Plaintiff claim to have an interest in.

**5.  The Pledge Is Unenforceable Since Zanna Shakib Did Not Execute Or Approve The Transfer of The Trust Assets.**

1      Under the express terms of the Trust Zanna Shakib was a co-trustee of the Trust.  The Trust

2  Agreement provides that:

3      IV Powers of the Trustee.

4      "B. Multiple Trustees. Unless otherwise provided in the Plan, a power vested in two or more

5      Trustees may only be exercised by their unanimous action."

6      It is undisputed that Zanna Shakib as Co-trustee of the Trust did not execute the Pledge and

7

8  Security Agreement or any other document.  Therefore, under the express provisions of the Trust any

9  assignment or transfer of the property of the Trust would require the unanimous consent and signature

10 of the both Co-trustees.

11     Further, as Zanna Shakib is a participant under the Trust and under the case law cited herein she

12 was permitted to direct the investment of her own portion of the Trust assets.  Paragraph E in Article III

13 partially states, "…the Participants are empowered to direct and manage the share of the Trust assets

14
15 held in their Accounts …."  Zanna Shakib was not empowered to manage her own portion of the assets

16 she had in the Collateral through the Trust, by the pledge of the entirety of the CD.  Zanna Shakib as a

17 Trustee had the ability to:

18     … decline to implement any investment direction that the Trustee determines (if implemented):

19

20     (a)   would result in a prohibited transaction;
       (b)   would jeopardize the Plan's tax qualified status;
21     (c)   would not be in accordance with Plan documents;
       (d)   would generate unrelated business taxable income;
22     (e)   could result in a loss exceeding the Participant's account balance; or
       (f)   would cause the indica of ownership of plan assets to be outside the jurisdiction
23           of the district courts of the United States, other than as permitted under ERISA
             Section 404(b) and its regulations.  (Article III(F)(2))
24

25 There is no question of fact that Zanna Shakib was empowered to exercise her discretion over her

26 portion of the Collateral as a participant, and that she did not execute the Pledge.

27
                                          12
28

1

2  **B.**     **SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF DEFENDANTS**

3        The undisputed facts of this matter establish that the Plaintiff's claims on the CD are void.

4  First, the CD is subject to the Trust which includes provisions that do not allow for the assets to be

5  pledged.   Second, even if the Trust is deemed a non-ERISA compliant plan it is a spendthrift trust,

6  which  prohibits alienation.  Third, Simon Shakib was not authorized nor permitted under the Trust to

7  pledge the assets without unanimous consent of the other Trustee, Zanna Shakib, nor was he permitted

8  to pledge all of assets of the Trust of other participants.   Additionally, the Pledge and Security

9  Agreement were executed by Simon Shakib, individually and as Manager of Nevada K. LLC, but the

10  actual owner of the CD, the Trust, never executed any documents.  Fourth, the UCC-1 filing is executed

11  by Windmill Market, LLC which is not a proximate party to the Pledge and Security Agreement or to

12  the Trust, and therefore cannot be the debtor on the UCC-1.   Since there is no question of fact on these

13  issues summary judgment must be granted in favor of Defendants.   The underlying facts of these

14  statements are undisputed based on the express language of the related documents and summary

15  judgment should be granted in favor of Defendants.

16  . . .

17  . . .

18  . . .

19  . . .

20  . . .

21  . . .

22  . . .

23  . . .

13

. . .

## IV.

## <u>CONCLUSION</u>

Wherefore based on the foregoing, Defendants respectfully requests that this Court enter summary judgment in their favor as the Pledge and Security Agreement is materially defective, the Trust does not allow for the unilateral execution of that agreement and the execution of the Pledge contradicts several passages of the Trust, that the CD which is property of Trust in not alienable under its strict provisions and case law.

Dated this 5th day of April, 2012.

CJD LAW GROUP, LLC


By:     __/s/ H. Stan Johnson_____
        H. STAN JOHNSON, ESQ.
        Nevada Bar No.: 0265
        BRIAN A. MORRIS, ESQ.
        Nevada Bar No.: 11217
        6293 Dean Martin Drive, Ste. G
        Las Vegas, NV 89118

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 5th day of April, 2012, a true and correct copy of the

foregoing **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was served by placing a copy

thereof in the US Mail at Las Vegas, Nevada, with proper postage prepaid, addressed to the following:

Doreen Spears Hartwell, Esq.
LIONEL SAWYER & COLLINS
1700 Bank of America Plaza
300 South Fourth Street
Las Vegas. Nevada 89101
Attorneys for Plaintiff


<u>            /s/ Ciara Geiss            </u>.
An Employee of CJD LAW GROUP, LLC

15